**NATIONAL LABOR RELATIONS BOARD**

**v.**

**LAMBERT et al.**

**No. 14568.**

United States Court of Appeals,
Fifth Circuit.

Feb. 23, 1954.

Rehearing Denied March 22, 1954.

A. Norman Somers, Asst. Gen. Counsel, N.L.R.B., David P. Findling, Assoc. Gen. Counsel, Arnold Ordman, George J. Bott, General Counsel, Frederick U. Reel, Maurice Alexandre, Washington, D. C., for petitioner.

Emil Corenbleth, Harold C. Abramson, Corenbleth, Thuss & Jaffe, Dallas, Tex., for respondent.

Before HUTCHESON, Chief Judge, and BORAH and RIVES, Circuit Judges.

RIVES, Circuit Judge.

The Board petitions for enforcement of its order issued against respondents on March 28, 1952, mainly based upon findings that respondents refused to bargain in good faith with the Union,[1] and thereafter refused to rehire certain named employees who had gone out on strike. See 98 N.L.R.B. 848.

Respondents are engaged in the manufacture and sale of women's blouses and related garments, with their principal office at Dallas, Texas. From December, 1944 until December 1, 1949, respondent company, under continuous collective bargaining contracts, had recognized and negotiated with the Union as the exclusive bargaining representative of its production employees. On December 1, 1949, the current bargaining agreement expired and respondents thereafter refused to negotiate another contract with the Union, the testimony being disputed as to whether the refusal to bargain occurred in December, 1949, at which time the Union concededly represented a majority of respondents' employees; or whether it occurred in January, 1950, when the Union had lost its majority. It appears that on December 7, 1949, there were thirty-six production employees on respondents' payroll, twenty-five of whom were members of the Union. On December 8, 1949, the Union representative, Erple Reams, met with respondent, Irving Lambert, for the stated purpose of discussing respondents' arrearages in the payment of vacation pay due employees for the summer of 1949 and the payment of contributions to an employee's health fund, such payments being required under the bargaining contract which had expired on December 1. Lambert testified that the company fell behind in these payments as a result of "Not having finances to pay them", and advised Reams that there was no point in negotiating these matters since the Union's contract had expired. Reams testified that she stated that they would enter into another contract and that Lambert replied, "No, I will not write another contract. I will not sign another one with the Union. * * * I cannot afford to operate under a union agreement any longer." Lambert denied having made this statement. On the following day, December 9, the Union held a meeting at which the twenty-five members from among respondents' thirty-six production employees were present, and Reams informed them that their bargaining contract had expired and that respondents had refused to negotiate further. The employees voted to strike but held a strike temporarily in abeyance at Reams' suggestion, in the hope that the dispute might be worked out amicably. On December 12, 1949, respondent, Irving Lambert, informed the employees assembled at his instance

1. Dallas Joint Board, International Ladies' Garment Workers' Union, A.F.L.

that, "he was not going to sign a new contract" because "he couldn't afford to operate under a union contract any more"; that they would have to give up their health center benefits, but that union dues would provide for about three paid holidays; that the employees would have a paid vacation "if he had the money," but that payment of it might be late; and that he did not want "any Union talk going on in the shop."

During the second week of January, 1950, respondent, Irving Lambert, interrogated a number of employees regarding their desire to work under a union contract, and according to his testimony concluded from that investigation that the Union had lost its majority. When Union representative Reams requested a bargaining conference on January 26, Lambert, though agreeing to see Reams the next day, stated that a meeting would do no good, "because he had not changed his mind, that he still had no intention of signing another agreement." A Union meeting was called for that night, but during the afternoon Lambert addressed the employees, stating that he knew of the Union meeting and that the employees need not attend. On the following morning, January 27, 1950, Reams and another employee met with Lambert, who remained adamant in his refusal to enter into a new contract. On January 30 the Union called a strike, but only a minority of the production workers, fourteen out of thirty-three, honored the strike and participated in the picketing of respondents' plant.

On May 12 Reams sent a telegram to respondents requesting a bargaining conference, and on May 24 counsel for the Union wrote respondents again requesting a bargaining conference and suggesting a specific time and place for meeting. Respondents did not reply to either of these communications. On February 15, 1951, ten of the fourteen employees who had gone out on the January 30, 1950 strike sent respondents a letter requesting reinstatement, to which also they failed to reply.

The Trial Examiner and the Board found on the basis of the above outlined testimony that on December 8, 1949, while the Union represented a majority of respondents' employees in an appropriate unit, respondents did not entertain any good faith doubts concerning its authority, and that Lambert's refusals on December 8, January 27, May 12 and May 24 to bargain with the Union, coupled with his by-passing of the Union and making changes in the employees' health benefits and paid vacations, were in violation of Sections 8(a) (5) and (1) of the Act, 29 U.S.C.A. § 158(a) (1, 5); that, since any loss of majority by the Union on and after December 12 was due to respondents' unlawful refusal to bargain on December 8, such loss did not terminate respondents' duty to bargain in good faith; finally, that respondents further violated the Act by their refusal to reinstate the ten unfair labor practice strikers who made unconditional applications for return to work on February 15, 1951.

Respondents, in addition to certain jurisdictional and procedural contentions,[2] strenuously insist that the Union did not specifically request a new bargaining contract until January 27, 1950, at which time it had already lost its majority status and respondents were under no

---

2. Without discussing respondents' arguments in detail, we think the issues as to whether the Union was in compliance with Sections 9(f), (g) and (h) of the Act, 29 U.S.C.A. § 159(f-h), so as to support the Board's jurisdiction; whether the amended charge was timely filed under Section 10(b) of the Act, 29 U.S.C.A. § 160(b); and whether the charges were properly sworn to and set forth with the required particularity; were properly resolved by the Trial Examiner and the Board against respondents. See N. L. R. B. v. Dant, 344 U.S. 375, 73 S.Ct. 375, 97 L.Ed. 407; cf. J. A. Bentley Lumber Co. v. N. L. R. B., 5 Cir., 180 F.2d 641, 642; N. L. R. B. v. Houston & North Texas Motor Freight Lines, 5 Cir., 193 F.2d 394, 397; N. L. R. B. v. Westex Boot & Shoe Co., 5 Cir., 190 F.2d 12, 13–14.

duty to bargain further with it; that the strike was illegal and respondents had the right to replace the striking employees with no obligation of reinstating them; that, in any event, the lapse of time and changed conditions since the filing of the original charge would render enforcement of the Board's order unfair and inequitable; and, finally, that the Board erred in denying respondents the opportunity to adduce evidence to show that the striking employees had used threats and profane language to intimidate other employees of respondents during the strike.

We think that substantial evidence on the record considered as a whole supports the finding that respondents' refusal to bargain first began on December 8, 1949, at which time the Union admittedly still represented a majority of the production employees; and that, the Union's subsequent loss of majority being fairly attributable to respondents' unfair labor practices, it did not excuse or condone respondents' subsequent refusals to recognize or deal with the Union. See Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 687, 64 S.Ct. 830, 88 L.Ed. 1007; D. H. Holmes Co. v. N. L. R. B., 5 Cir., 179 F.2d 876, 879–880. It follows that the resulting strike by a minority of the production workers on January 30, 1950 was not illegal, but that the strike was a lawful one for recognition precipitated by respondents' persistent refusal to comply with the good faith bargaining requirements of the Act. See Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 704, 64 S.Ct. 817, 88 L.Ed. 1020; N. L. R. B. v. Lovvorn, 5 Cir., 172 F.2d 293, 294–295; D. H. Holmes Co. v. N. L. R. B., supra. Nor do we believe that, under the circumstances shown, respondents can successfully complain that changed conditions since their original refusal to bargain and the strike, such as replacement of the strikers seeking reinstatement, would render unfair and inequitable any enforcement of the Board's order. In view of respondents' adamant refusal throughout to recognize or bargain with the Union and the long resulting strike, we think the application for reinstatement by the employees here involved was timely filed, and that respondents were required to reinstate them upon their request even though they had been replaced. N. L. R. B. v. Crosby Chemicals, 5 Cir., 188 F.2d 91, 95; Olin Industries, Inc. Winchester Repeating Arms Co. Division v. N. L. R. B., 5 Cir., 191 F.2d 613, 617–618; cf. N. L. R. B. v. Childs Co., 2 Cir., 195 F.2d 617.

The Trial Examiner refused to admit the evidence offered by respondents as to Union misconduct during the strike and evidence of intimidation of other employees by the strikers on the ground that such misconduct was not a material defense to the violations charged, and that respondents' appropriate remedy was to file charges with the Board.[3] Respondents did not offer to prove at the hearing that the employees seeking reinstatement were involved in the alleged Union misconduct, or that they ever denied them reinstatement for that reason. Four years having now elapsed since the unfair labor practices and strike occurred, and approximately three years having transpired since these ten employees made application for reinstatement, we do not think that final disposition of this controversy should be further delayed by a remand to the Board for the consideration of evidence as to which, at the hearing, no proper offer of specific and relevant proof on the reinstatement issue was made. As the Sixth Circuit has recently held in N. L. R. B. v. Deena Artware, Inc., 6 Cir., 198 F.2d 645, 652, "unauthorized acts of violence on the

3. It further appears that a Texas State Court has denied respondents' application for a temporary injunction to restrain the same alleged Union misconduct. Sue-Ann Manufacturing Co. v. International Ladies' Garment Workers' Union, etc., No. 42562–E, 101st Judicial District Court of Dallas County, Texas, order dated April 25, 1950.

part of individual strikers are not chargeable to other Union members in the absence of proof that identifies them as participating in such violence." See also, N. L. R. B. v. Crowley's Milk Co., 3 Cir., 208 F.2d 444, 446; N. L. R. B. v. Wallick, 3 Cir., 198 F.2d 477, 485, n. 10.

The order of the Board is Enforced.